NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 08-10201 |
| JEROME M. LARSON, JR., | : | Chapter 7 |
| Debtor. | : | |
| JEFFREY T. MARVIN AND JUDITH A. MARVIN, | : | |
| Plaintiffs, | : | |
| vs. | : | Adversary No. 08-1214 |
| JEROME M. LARSON, JR., | : | |
| Defendant. | : | **MEMORANDUM OPINION** |
| | : | Trial:   April 16, 2009 |

### APPEARANCES

Catherine M. Carton, Esquire
**WIDMAN, COONEY & WILSON, LLC**
1803 Highway 35
Oakhurst, New Jersey 07755
Attorney for Plaintiffs

Richard J. Pepsny, Esquire
**LAW OFFICE OF RICHARD J. PEPSNY**
240 Maple Avenue
Red Bank, New Jersey 07701
Attorney for Defendant

THE HONORABLE KATHRYN C. FERGUSON, USBJ

Jeffrey and Judith Marvin filed the within complaint in the bankruptcy matter of Jerome M. Larson Jr. seeking a determination of non-dischargeability. The complaint is based on 11 U.S.C. § 523(a)(2) and (6), and asks for permission to record a mortgage. The matter was tried on April 16, 2009, and the parties were given until May 11, 2009 to file post-trial submissions. The Plaintiffs filed a brief on April 20, 2009, but the Defendant did not make any further submissions. In his answer, Mr. Larson asserted twenty separate affirmative defenses that he largely abandoned: he did not submit any evidence in support of them at trial and did not make any post-trial submissions.

Nonetheless, the Court's analysis must begin with the first affirmative defense of failure to state a claim. The First Count of the complaint makes a series of factual allegations, but does not even fleetingly suggest the legal basis upon which it seeks relief. While the factual allegations will continue because they are incorporated in the other counts, the First Count will be dismissed for failure to state a claim. The Third Count simply alleges that the matter is a core proceeding and that Mr. Larson failed to act as justified under the circumstances. It is odd that the allegation of core jurisdiction does not appear until the Third Count, but it is beyond cavil that a non-dischargeability action is a core proceeding. The balance of the Third Count fails to state a claim and will be dismissed as well. That leaves us with the Second and Fourth Counts. The Second Count seeks relief under both § 523(a)(2) and § 523(a)(6). The Fourth Count seeks relief from the automatic stay to allow the Marvins to record a mortgage against 29 East Garfield Ave., Atlantic Highlands, NJ as security for an alleged consumer loan agreement.

Factual Findings

Some time in 2004, Dr. and Mrs. Marvin decided to undertake certain improvements to their home at 11 Montrose Road, Colts Neck, New Jersey. Dr. Marvin is a dentist and one of his patients,

Patrick Devine, recommended Jerome Larson for the work. The Marvins entered into an agreement on June 23, 2005 with Impressive Home Builders. Patrick Devine, Dr. Marvin's patient, signed the contract on behalf of Impressive Home Builders as its vice president. Work on the project commenced in late 2005 and there were many delays. In the meantime, the Marvins had developed a cordial relationship with Mr. Larson, but the relationship between Mr. Larson and Mr. Devine soured. Work on the house proceeded, as did installment payments, but not at the pace identified in the contract. Mr. Larson blamed the delays and problems with the project on Mr. Devine.

The parties agree that Mr. Larson approached the Marvins in March of 2006. There is some confusion about exactly what may have been offered and solicited. The Marvins thought they were entering into an agreement whereby they would loan Mr. Larson 30,000.00 in March and be repaid 35,000.00 in August or, at their option, take a share of the profits of a corporation to be called R.E.D. Inc. That corporation, formed after Mr. Larson took the $30,000.00 from the Marvins under the name J-R Green, Inc. had purchased real property in Long Branch with the intention to "flip" it in a hot real estate market. Mr. Larson was to invest "sweat equity" in the form of improvements to the property. He encouraged the Marvins to go look at the property and advised them where to find the key. The Marvins understood that Mr. Larson would secure their loan by giving them a mortgage on the house in Long Branch, as well as on the work done in their own home.

Dr. Marvin and Mr. Larson signed a Consumer Loan Agreement dated March 20, 2006. [Ex. D-1] The terms of that Agreement do not precisely track the deal the Marvins describe. To be sure, the document calls for repayment of the loan on August 22nd of that year for 35,000.00. It also gives Dr. Marvin a "security interest or mortgage" in the "Existing Impressive Home Builders contract,

made between Jeffrey and Judy Marvin and IHB for the addition and renovation of their home" and "[u]pon completion of the contract, shares of stock in Red Inc, Real Estate Development Incorporated, will be offered, representing up to 10% of their holdings (company presently being formed with Jerome Larson Jr. as Vice President, with 40% ownership)." The Agreement also called for interest payments of 1,000.00 per month if the obligation were not paid in full by August 22, 2006, and identified March 22, 2007 as the default date.

Months later, on June 6, 2006, the Marvins agreed to purchase 100 shares of Class A stock in J-R Green, Inc. on March 22, 2006. The option required them to hold the stock until August 22, 2006 when they had the right to convert the Class A Stock to common stock in J-R Green, Inc. for $300.00 per share or have the company repurchase their 100 Class A shares at $300.00 per share. There were also provisions for the accrual of interest in the event neither the Marvins converted the stock nor the company sold it.

Later that spring, Mr. Larson requested another loan from the Marvins, this time for $70,000.00 The Marvins were becoming concerned with the progress on their own home, and had told Mr. Larson they would not make any more payments until the work was done. Mr. Larson explained that the additional loan would ameliorate some of his cash flow problems and enable him to complete work on the Marvins' home. The Marvins were skittish, and claim that Mr. Larson attempted to soothe their fears by offering a lien on a lot adjacent to property that he owned in Atlantic Highlands, with his interest in a corporation known as Local Business, USA, as well as in a project that he was doing with his brother in Fair Haven. At the time, they still believed that he had a direct ownership interest in the property in Long Branch. Again, Mr. Larson encouraged the

Marvins to stop by the Fair Haven Project to evaluate it for themselves, which they did. The Marvins also did some research and decided they were uncomfortable with Local Business USA as collateral. Ultimately, both Judy and Jeffrey Marvin signed another Consumer Loan Agreement dated May 24, 2006 for $70,000.00 [Ex. D-3] As security, they took a "security interest or mortgage" in "20% of Jerome Larson Jr's Holdings" and "[a] potential face-value lien on Jerome Larson Jr.'s residence at 29 East Garfield Avenue, Atlantic Highlands."

As typically happens in cases that wind up before the bankruptcy court, things deteriorated thereafter. Mr. Larson only made $13,950.00 in payment on account of the loans governed by the Consumer Loan Agreements. He did not permit the Marvins to take a credit equal to any amount of the default as an offset against payments under their contract with Impressive Home Builders. The work on the Marvins' home was never completed to their satisfaction, and the Marvins were still living in a house under construction after two and a half years. The Marvins tried to work out terms with Mr. Larson, but were unable to do so. Mr. Larson filed his bankruptcy petition on January 6, 2008. Then, and only then, the Marvins came to understand that Mr. Larson had no ownership interest in the property in Long Branch, owned only a partial interest in the property in Atlantic Highlands and that the adjacent lot had not received subdivision approval, and that he did not have an ownership interest in his brother's business or the project in Fair Haven.

The gist of the Marvins' complaint is that Mr. Larson deliberately led them to believe or infer that his asset position was considerably different than it actually was. The Marvins assert that they would never have loaned him the monies they did if: 1) they had understood the true financial picture; and 2) did not feel pressure to help Mr. Larson as the only way to get the work on their

5

house completed.

## Analysis

A.  Second Count

As mentioned above, the Second Count of the complaint seeks a determination of non-dischargeability under two statutory sections: § 523(a)(2) and § 523(a)(6). Since the complaint does not indicate which subsection of § 523(a)(2) is implicated, there could be three theories under which non-dischargeability is sought.  The third subsection, § 523(a)(2)(C), is directed at credit card debt so it has no applicability here. The Court will discuss the remaining two subsections separately.  An additional difficulty presented by the complaint in that it merely states that "the obligation of the defendant" is non-dischargeable, without ever defining "obligation." There are three distinct obligations here: the Agreements relating to the improvements to the Marvins' home, the $30,000.00 loan, and the $70,000.00 loan.

(I) 11 U.S.C. § 523(a)(2)(A)

This subsection provides that a debtor is not discharged of any debt :

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, **other than a statement respecting the debtor's or an insider's financial condition** ...

11 U.S.C. § 523(a)(2)(A) (emphasis added).  As in all § 523 cases, the burden of proof is on the creditor to show all of the elements of §523(a)(2)(A) by preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 288-89 (1991).

The Third Circuit has yet to confront the issue of how properly to interpret the phrase "respecting the debtor's . . . financial condition" as an exception to dischargeability. Other courts

have adopted varying positions. The broadest view holds that it encompasses "any communication that has a bearing on the debtor's financial position." In re Joelson, 427 F.3d 700, 704 (10th Cir. 2005). Under this interpretation, a communication addressing the status of a single asset or liability satisfies this element. Under the strictest reading, only those communications that present "an overall picture of the debtor's financial position" trigger the exception to non-dischargeability. Id. Therefore, to satisfy this element utilizing the strict interpretation, the communications must "purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities." Id. Finally, some courts have staked out the middle ground, wherein "an emphasis appears to be placed upon both (a) whether the statement in issue constitutes "information [that] a potential lender or investor would generally consider before investing, and (b) the intended purposes of ...[such] statement." In re Booher, 284 B.R. 191, 212 (Bankr. W.D. Pa. 2002)(quoting In re Redburn, 202 B.R. 917, 926-29 (Bankr. W.D. Mich. 1996)).

The varying standards are really a question of academic interest in this case, since under each interpretation, the plaintiffs assert only that Mr. Larson made representations about his financial condition. For each transaction, they allege misrepresentations as to specific assets and liabilities and that those misstatements deliberately created a misimpression of Mr. Larson's overall net worth. Even if all of the allegations are true, they bring the statements outside the purview of § 523(a)(2)(A). To the extent that the Complaint seeks entry of a judgment under § 523(A)(2)(A), it will be denied.

   (ii)  11 U.S.C. §523(a)(2)(B)

This subsection provides that a debtor is not discharged of any debt:

>     to the extent obtained by use of a statement in writing –
>         (I) that is materially false;
>         (ii) respecting the debtor's or an insider's financial condition;
>         (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>         (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). Courts have generally held that "Section 523(a)(2)(B) pertains to a specific type of financial statement, 'one that specifically states a debtor's or insider's net worth." In re Flaherty, 335 B.R. 481, 489 (Bankr. D. Mass. 2005)(quoting City Fed. Savs. Bank. v. Seaborne (In re Seaborne), 106 B.R. 711, 713 (Bankr. M.D. Fla. 1989)). It is unnecessary for the financial statement to be a formal document produced by a commercial or banking institution. It need only to describe the financial condition of the debtor or an insider of the debtor. *See*, In re Flaherty, 335 B.R. at 489.

A creditor must prove five elements to prevail on a § 523(a)(2)(B) claim: "(1) the debtor made a statement in writing; (2) the statement concerned the debtor's financial condition; (3) the statement was materially false; (4) the debtor made the representation with an intent to deceive the creditor; and (5) the creditor actually and reasonably relied on the misrepresentation." In re Cohen, 334 B.R. 392, 398 (Bankr. N.D. Ill. 2005)(citing In re Morris, 223 F.3d 548, 552 (7th Cir. 2000)). Again, the burden of proof is on the creditor to show all of the elements by a preponderance of the evidence. *See*, Grogen v. Garner, 498 U.S. 279 (1991).

The Court's analysis starts and ends with the first element. The Plaintiffs did not produce a shred of evidence that Mr. Larson ever gave them any written financial statement in connection with any of the transactions. The only evidence of misleading financial information references oral representations. To the extent that the Complaint seeks a judgment excepting any of the debt in

question from discharge, it will be denied.

### (iii) 11 U.S.C. § 523(a)(6)

The Second Count also attempts to except this debt from discharge pursuant to § 523(a)(6). That section provides that:

> [a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6). Once more, the plaintiff bears the burden of proving by a preponderance of the evidence that a debt is excepted from discharge under §523(a)(6). *See,* Grogen v. Garner, 498 U.S. 279, 291 (1991); In re Sexton, 342 B.R. 522, 530 (Bankr. N.D. Oh. 2006) (applying the burden specifically in a § 523(a)(6) complaint).

Federal law determines what constitutes "willful" and "malicious." *See,* In re Little, 335 B.R. 376, 383 (Bankr. N.D. Oh. 2005). For the purposes of satisfying section 523(a)(6) "[o]nly acts done with intent to cause injury, and not merely acts done intentionally, rise to the level of willful and malicious injury." In re Sexton, 342 B.R. 522, 530 (Bankr. N.D. Oh. 2006) (citing Kawaauhau v. Geiger, 523 U.S. 57, 57-58 (1998)). As the Supreme Court explained, "[t]he word 'willful' in §523(a)(6) modifies the word 'injury', indicating that under §523(a)(6) takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Kawaauhau, 523 U.S. at 61 (holding that for a debt to be nondischargeable as willful and malicious, the injury must be deliberate or intentional; it is not sufficient to allege a deliberate or intentional act which leads to injury); In re Groff. 301 B.R. 644 (Bankr. D.N.J. 2003) (holding that while the death of a nine year old girl was the result of an action that was willful and intentional, the death was not intended;

§ 523(a)(6) was not satisfied). Most courts interpreting Geiger have found that willfulness requires that the act have been "voluntary", and "deliberate or intentional" and must have been directed to causing the "injury" which is the focus of the § 523(a)(6) action. In re Whiters, 337 B.R. 326, 334 -37 (Bankr. N.D. Ind. 2006).

Willfulness involves a separate and distinct analysis from the element of malice. A person's actions are considered malicious when they are committed in "conscious disregard of his or her duties or without just cause or excuse." Id.   "An injury has been defined as malicious under § 523(a)(6), when it is: '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." In re Little, 335 B.R. at 384 (citing In re Sicroff, 401 F.3d 1001, 1006 (9th Cir. 2005). Negligence and recklessness are not sufficient to establish that a result was willful and malicious. *See,* In re Ingui, 2006 WL 637139 *2, n. 2 (Bankr. E.D. Pa. 2006)(citing Kawaauhau, 523 U.S. at 64). Because the requirements in the statute are set forth in the conjunctive, both willfulness and malice must be shown in order to prevail under section 523(a)(6). Sexton at 530.

Putting the foregoing together, the Court determines that in order to sustain an action under 11 U.S.C. § 523(a)(6), a creditor must demonstrate: (1) that the debtor's actions caused an "injury" to the person or property interest of the creditor; (2) that the debtor's actions which caused the injury were the result of "willful" conduct by the debtor by which the debtor intended to effect an injury to the person or property interest of the creditor; and (3) that the debtor's "willful" acts were undertaken in a "malicious" manner.

The overwhelming majority of cases under § 523(a)(6) involve tort claims. While a few courts have held that certain frauds have been so egregious that they trigger § 523(a)(6), *see, e.g.,* In re D'Amato, 341 B.R. 1 (8th Cir. BAP 2006); In re Anderson 403 B.R. 871, 881 (Bankr. D. Kan. 2009), the better- reasoned majority of the courts to have considered the issue have concluded that although " fraud or misrepresentation is often identified as an intentional tort, it is already covered by its own dischargeability provision [523(a)(2)(A) and (B)]. Without an identifiable analog under common law different from the cause of action for fraud that is already redressed by § 523(a)(2)(A), the [ ] argument does not give any convincing warrant for stretching the substantive ambit of § 523(a)(6)." *See*, In re Neumann, 374 B.R. 688, 711 (Bankr. D. Minn.2007) *as cited in* In re Khouri, 397 B.R. 111, 121 (Bankr. D. Minn. 2008).

This Court is not inclined to adopt the view that egregious fraud can trigger non-dischargeability under § 523(a)(6). Since the Third Circuit has yet to rule on the issue, however, the Court will assume for the purposes of this opinion that fraud can trigger non-dischargeability under both § § 523(a)(2) and (6). The evidence submitted in support of this theory is simply not sufficient to conclude that Mr. Larson intentionally defrauded the Marvins with the express purpose of causing them injury. That is, even if Mr. Larson made gross misrepresentations to the Marvins, the record contains scant evidence that he did so for the purpose of defrauding them. He continued to work on their home improvement project and on the projects in Long Branch and Fair Haven until he ran out of money. He may have even intended to mislead them. But if he did not intend to take the money with no intention of repaying it and with the intention of causing injury to the Marvins, they cannot meet their burden of proving willfulness under § 523(a)(6). Since the burden is to establish each of

the elements, judgment on a § 523(a)(6) theory must be denied without even getting to "malice."

Therefore, the Court finds that the Plaintiffs have not sustained their burden of proof with regard to any of the legal theories in the Second Count.

B.  Fourth Count

Finally, in the Fourth Count, the Marvins ask that they be allowed to record their mortgage against 29 East Garfield Ave, Atlantic Highland, New Jersey, based on provisions of the June 2, 2006 consumer loan agreement[1]. The theory underlying this request for relief is unclear. Presumably, it is a matter of contract interpretation.  Indeed, the Agreement provides that Mr. Larson gave to the Marvins "what is known as a security interest or mortgage in ... a potential face value lien on Jerome Larson Jr.'s residence at 29 East Garfield Ave, Atlantic Highlands." The Marvins testified that they believed this document and this language protected them, and that Mr. Larson would record a mortgage. Although they signed a mortgage on their own home, they were unsophisticated about the requirements to perfect a mortgage. They were unrepresented in the transactions, Mr. Larson drafted all of the documents and they assumed that he would take care of any "ancillary issues."

Mr. Larson testified that the phrase "potential face value lien" meant that the Marvins could perfect a lien when and if he defaulted under the Agreement. He testified that the Marvins never asked him to sign a mortgage or deliver possession of stock and never even asked if he recorded anything.

---

[1] The Complaint refers to "the consumer loan agreement of June 2, 2006" but the agreement is actually dated May 24, 2006, it was merely signed on June 2, 2006.

The provision of the Agreement relating to a mortgage is entirely unclear. Since Mr. Larson admits that he drafted the Agreement, any ambiguity must be construed in favor of the Marvins. LoBianco v. Harleysville Ins. Co., 368 N.J. Super. 515 (Law Div. 2003). Nonetheless, even assuming that the Marvins had an immediate right to record a mortgage lien against the property, there is no provision of the Agreement that would require Mr. Larson to do that for them. To permit them to do so now, after the underlying debt had been determined to be subject to discharge, would violate the discharge injunction.

Accordingly, the Court finds that the Plaintiffs have not established entitlement to relief under the Fourth Count.

## Conclusion

The First and Third Counts of the complaint are dismissed for failure to state a claim. The Court finds that the Plaintiffs have failed to sustain their burden of proof as to the Second and Fourth Counts. The Complaint can be dismissed in its entirety and the adversary proceeding closed.

*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: July 14, 2009